**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**J.S., J.P., and T.S.**, by their parent and natural guardian, **TONIQUE PROCTOR**, individually and on behalf of all others similarly situated,
c/o Tycko & Zavareei LLP
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, D.C. 20006

Plaintiffs,

v.

**CERNER CORPORATION**

Serve on:
Corporation Service Company
1156 15th St NW, Suite 605
Washington, DC 20005

**CHILDREN'S NATIONAL HOSPITAL**

Serve on:
CT Corporation System
1015 15th St NW, Suite 1000
Washington, DC, 20005

Defendants.

Case No. _______________

**DEMAND FOR JURY TRIAL**

**CLASS ACTION COMPLAINT**

This class action arises from Defendants' failure to protect highly sensitive personal and medical information entrusted to their electronic health record ("EHR") and data-hosting systems. Plaintiffs J.S., J.P., and T.S., minors, by their parent and natural guardian, Tonique Proctor ("Plaintiffs"), bring this action individually and on behalf of all others similarly situated against Cerner Corporation ("Cerner") and Children's National Hospital ("Children's National") (collectively, "Defendants").

At all relevant times, Cerner provided the EHR platforms and related data-hosting services used by Children's National Hospital, while Children's National collected, transmitted, and entrusted its patients' highly sensitive personal and medical information to those systems in connection with the provision of healthcare services. Defendants jointly operated, controlled, supported, and used the EHR and data-hosting environments at issue, and shared responsibility for implementing reasonable cybersecurity safeguards, access controls, monitoring, and incident-response measures to protect Plaintiffs' Private Information.

## INTRODUCTION

1. This class action arises from Defendants' failure to safeguard the highly sensitive personal and medical information entrusted to their EHR and related data-hosting systems.

2. Cerner is a healthcare information-technology company that provides EHR platforms, data-hosting, and related services to healthcare institutions throughout the United States, including Children's National.

3. Defendant Children's National Hospital is a healthcare provider headquartered in the District of Columbia. In the course of providing medical care, Children's National collected, transmitted, and entrusted its patients' highly sensitive personally identifiable information ("PII") and protected health information ("PHI") to Cerner's EHR and data-hosting systems.

4. At all relevant times, Defendants jointly used, operated, controlled, and relied upon the EHR and data-hosting environments at issue to store, process, and maintain Plaintiffs' and the Class's Private Information. The Data Breach giving rise to this action occurred within those EHR and data-hosting environments used by Defendants in connection with Children's National's patient data.

5. As a result, Defendants maintained large volumes of highly sensitive PII and PHI for patients and families served by Children's National Hospital, including, upon information and belief, names, dates of birth, addresses, Social Security numbers, medical record numbers, diagnoses, treatment information, laboratory results, images, medications, and other confidential medical data.

6. This highly sensitive information was inadequately protected and was thereby exposed to cybercriminals in a data breach (the "Data Breach").

7. It is unknown precisely how long cybercriminals had access to Defendants' systems before the breach was discovered. Defendants lacked effective means to prevent, detect, stop, or mitigate unauthorized access to their systems, allowing cybercriminals prolonged and unrestricted access to Plaintiffs' and the Class's Private Information.

8. Upon information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to implement reasonable and industry-standard cybersecurity safeguards, failed to adequately monitor their networks, and failed to maintain sufficient protocols to secure Plaintiffs' and the Class's Private Information. These failures placed that information in a dangerously vulnerable position, rendering it an easy target for cybercriminals.

9. Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves and all others harmed by Defendants' misconduct. The exposure of Private Information to cybercriminals is a bell that cannot be unrung—before the Data Breach, Plaintiffs' and the Class's sensitive information was private; now it is exposed, unsecured, and permanently at risk.

## PARTIES

10. Plaintiffs J.S., J.P., and T.S. are natural persons and citizens of the District of Columbia. As minors, they bring this action through their parent and natural guardian, Tonique

Proctor, who is domiciled in the District of Columbia (where she intends to remain). Each Plaintiff received a notice of breach dated October 29, 2025.

11. Defendant Cerner Corporation ("Cerner") is a Delaware corporation with its principal place of business in Kansas City, Missouri. At all relevant times, Cerner designed, operated, maintained, and supported the Cerner EHR systems and related infrastructure used by Children's National Hospital and was responsible for safeguarding patient PII and PHI stored within those systems. Cerner may be served through its registered agent for service of process.

12. Defendant Children's National Hospital is a healthcare institution headquartered in the District of Columbia. At all relevant times, Children's National Hospital collected, transmitted, and maintained highly sensitive personally identifiable information ("PII") and protected health information ("PHI") of its patients, including Plaintiffs, and was responsible for ensuring that such information was safeguarded in compliance with federal and state law.

**JURISDICTION AND VENUE**

13. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

14. This Court has personal jurisdiction over Defendants because they purposefully availed themselves of the District of Columbia by providing, maintaining, and supporting EHR and data-hosting services for healthcare providers serving District residents, including Children's National Hospital, and by collecting, storing, and safeguarding the Private Information of District residents.

15. Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiffs reside in the District of Columbia, a substantial portion of the effects of Defendants' misconduct were felt in this District, and Defendants transact substantial business in this District.

## FACTUAL ALLEGATIONS

***Defendants Collected and Stored the PII of Plaintiffs and the Class***

16. Cerner and Children's National provide and utilize EHR platforms, data-hosting, and related information-technology services in connection with the delivery of healthcare services to patients throughout the United States.

17. As part of these EHR and data-hosting arrangements, Children's National collects and transmits, and Cerner receives, stores, maintains, processes, and transmits, the PII and PHI of patients treated at Children's National, including Plaintiffs and the Class.

18. In providing healthcare services, Children's National requires that large volumes of patient PII and PHI be transmitted to and stored within Cerner's EHR and data-hosting environments, including, upon information and belief, names, addresses, dates of birth, Social Security numbers, medical record numbers, diagnoses, treatment information, medications, laboratory results, images, and other highly confidential medical data.

19. At all relevant times, Defendants jointly used, operated, controlled, and relied upon the EHR and data-hosting environments at issue to store, process, and maintain Plaintiffs' and the Class's Private Information. Each Defendant was independently and jointly responsible for implementing reasonable safeguards to protect that information from unauthorized access, acquisition, or disclosure.

20. Defendants expressly and implicitly agreed—through their respective roles as HIPAA Covered Entity (Children's National) and Business Associate (Cerner), their contractual obligations, internal policies, and applicable state and federal law—to secure and safeguard Plaintiffs' and Class Members' Private Information.

21. Plaintiffs and Class Members reasonably expected that Defendants would employ industry-standard and legally required safeguards to protect their Private Information. Plaintiffs and Class Members themselves took reasonable steps to secure their information and had no ability to control Defendants' cybersecurity practices or failures.

22. Under state and federal law—including HIPAA, HITECH, state data-breach notification statutes, and common-law duties of reasonable care—healthcare providers and their EHR vendors, such as Defendants, have affirmative obligations to safeguard the PII and PHI they maintain and to provide timely and accurate notice of any breach compromising that information.

23. Defendants expressly acknowledge these obligations in their publicly available policies, contracts, and representations, including statements that they implement technical and organizational safeguards designed to protect personal information from unauthorized access, disclosure, or misuse and that they require compliance with applicable privacy and security laws:

24. Through these representations, Defendants affirmatively represent that they: (a) implement and maintain reasonable and industry-standard security measures; (b) require the safeguarding of confidential information; (c) do not improperly disclose personal information; and (d) ensure appropriate protections when personal information is transmitted or stored within their systems.

***Defendants' Data Breach***

25. On or about July 10, 2025, Defendants suffered a data-security incident (the "Data Breach") that compromised the highly sensitive Private Information of Plaintiffs and Class Members.

26. Upon information and belief, the Data Breach involved a sophisticated cyberattack carried out by the notorious ransomware and data-extortion group known as CL0P, which gained unauthorized access to systems containing Plaintiffs' and Class Members' PII and PHI.

27. Public reporting indicates that CL0P exploited a previously unknown or unpatched vulnerability affecting enterprise data systems, with suspicious activity dating back to at least July 10, 2025, and escalating in August 2025, during which the threat actor successfully exfiltrated substantial volumes of sensitive data from impacted organizations.

28. Upon information and belief, the unauthorized access occurred within Defendants' EHR-related backend, data-migration, and data-processing environments—systems designed to ingest, consolidate, and transfer patient data at scale in connection with Children's National Hospital's healthcare operations.

29. Upon information and belief, Defendants became aware of suspicious activity, unauthorized access, or data exfiltration no later than August 2025, yet failed to provide timely notice to Plaintiffs and Class Members and instead delayed notification until late October 2025.

30. By keeping Plaintiffs and Class Members in the dark for months, Defendants deprived them of the opportunity to take timely steps to mitigate harm, including monitoring financial and medical accounts, placing fraud alerts, freezing credit, or otherwise protecting themselves and their children from identity theft and fraud.

31. Defendants breached their duties by failing to implement reasonable and industry-standard security measures, failing to adequately monitor their systems, and failing to promptly detect and contain the Data Breach. As a result, cybercriminals were able to infiltrate Defendants' systems and exfiltrate Plaintiffs' and the Class's Private Information.

32. Despite knowledge of the Data Breach, Defendants have taken no meaningful or adequate steps to fully remediate the incident, to prevent further misuse of stolen information, or to provide sufficient mitigation or protection services to Plaintiffs and Class Members.

33. Because of Defendants' failures, the sensitive PII and PHI of Plaintiffs and Class Members was placed directly into the hands of cybercriminals, resulting in numerous injuries and significant, ongoing damages.

34. Publicly available evidence demonstrates that data stolen in CL0P-related attacks has already been trafficked, sold, or otherwise exploited by cybercriminals. Nevertheless, Defendants have still failed to provide adequate notice, mitigation, or remediation to affected individuals.

35. Accordingly, upon information and belief, Plaintiffs' and the Class's stolen Private Information has already been published—or will imminently be published—on dark-web forums controlled by or associated with the CL0P ransomware group, where it may be bought, sold, and misused indefinitely.

***Plaintiff J.S.'s Experiences***

36. Plaintiff J.S. is a minor and a Data Breach victim. Her sensitive PII and PHI were stored within Defendants' systems because she received medical services at Children's National Hospital, which relies on Defendants' EHR and data-hosting services.

37. Defendants obtained and maintained J.S.'s Private Information as part of their role hosting and storing Children's National's patient data.

38. As a direct result of Defendants' Data Breach, J.S.'s highly sensitive Private Information was exposed to cybercriminals.

39. J.S.'s parent and natural guardian, Ms. Proctor, is extremely careful about the security of her children's information. She never knowingly transmits their sensitive data in unsafe ways and stores documents containing Private Information in secure, controlled locations.

40. In seeking and receiving medical care for J.S., Plaintiffs reasonably relied on Children's National—and, by extension, Defendants—to protect J.S.'s Private Information using reasonable and industry-standard security safeguards.

41. Defendants obtained, stored, and continue to maintain J.S.'s Private Information and had a continuing legal duty to protect that data from unauthorized access and disclosure.

42. Because the Data Breach placed J.S.'s highly sensitive medical and identifying information directly into the hands of cybercriminals, J.S.'s Private Information has already been published—or will inevitably be published—on the dark web.

43. J.S. and her family have already been forced to take numerous mitigation steps, including heightened account monitoring, fraud-prevention efforts, and protective measures they would not otherwise need to undertake.

44. Following the Data Breach, J.S.'s family experienced a significant spike in scam calls, phishing attempts, and suspicious contacts, indicating misuse of their information.

45. The family now lives with heightened anxiety, fear, and stress about what information was exposed, how it will be used, and the lifelong risks a minor faces when her Social Security number and medical information circulate among cybercriminals.

46. J.S. suffered actual injury because the theft and exposure of her Private Information violates her rights to privacy.

47. J.S. suffered diminution in the value of her Private Information—an intangible but legally recognized form of property Defendants were required to protect.

48. J.S. faces imminent and looming risks of identity theft, fraud, medical identity misuse, and long-term financial harm, especially because minors' stolen identities are often used for years before detection.

49. J.S. and her family will be forced to spend time and money for years to monitor and protect her identity as a direct consequence of Defendants' failures.

50. J.S. has a continuing interest in ensuring that her Private Information—still stored and backed up on Defendants' systems—does not remain vulnerable to further unauthorized access.

***Plaintiff J.P.'s Experiences***

51. Plaintiff J.P. is a minor and a Data Breach victim. His sensitive PII and PHI were entrusted to Children's National and stored by Defendants in their EHR and data-hosting environments.

52. Defendants obtained and maintained J.P.'s Private Information, making Defendants responsible for safeguarding it.

53. As a result of Defendants' Data Breach, J.P.'s sensitive information was compromised and placed in the hands of cybercriminals.

54. J.P.'s mother, Ms. Proctor, is diligent about protecting her children's information, never transmits it without necessity, and stores all documents containing their data securely.

55. In seeking medical care, Plaintiffs reasonably believed Defendants would use industry-standard cybersecurity measures, follow their own policies, and comply with federal and state law to protect J.P.'s information.

56. Defendants retained J.P.'s Private Information, creating an ongoing obligation to safeguard it.

57. On information and belief, J.P.'s Private Information has already been published—or will imminently be published—on dark-web forums controlled by the CL0P ransomware group and other malicious actors.

58. J.P. and his family have already had to invest substantial time and effort monitoring for fraud, misuse, and suspicious activity.

59. J.P.'s family experienced a measurable increase in spam calls, scam messages, and phishing activity following the breach.

60. J.P. and his family reasonably fear for his financial security, medical identity, and long-term privacy, knowing that stolen minor identities are especially vulnerable to prolonged misuse.

61. J.P. suffered actual injuries, including the violation of his right to privacy and exposure of his sensitive identity and medical data.

62. J.P. suffered diminution in the value of his Private Information—property Defendants were required to protect.

63. J.P. faces ongoing and substantial risk of identity theft, financial fraud, medical identity misuse, and other harm for years to come, particularly because minors' identities can be used undetected over long windows of time.

64. J.P. and his family will be required to monitor and safeguard his identity for years, incurring significant time and cost.

65. J.P. has a present and continuing interest in ensuring Defendants properly protect the Private Information still in their possession.

***Plaintiff T.S.'s Experiences***

66. Plaintiff T.S. is a minor and a Data Breach victim. His highly sensitive PII and PHI were stored by Defendants as part of their role hosting Children's National's patient data.

67. Defendants obtained, maintained, and controlled T.S.'s Private Information and were required to safeguard it.

68. Defendants' Data Breach compromised T.S.'s Private Information, exposing it to cybercriminals.

69. T.S.'s parent and natural guardian, Ms. Proctor, has always exercised extreme caution with her children's data, storing it securely and limiting disclosures to necessary medical providers.

70. Plaintiffs reasonably relied on Defendants to follow their own stated privacy and security practices, as well as federal and state requirements governing the protection of patient PII and PHI.

71. Defendants continue to store and back up T.S.'s Private Information, giving rise to ongoing obligations to protect it.

72. On information and belief, T.S.'s Private Information has already been trafficked—or will imminently be trafficked—on dark-web marketplaces, where minors' information is especially valuable to identity thieves.

73. T.S. and his family have already spent significant time monitoring accounts, securing records, and attempting to protect against identity misuse.

74. They also experienced a sharp increase in fraudulent calls, scam attempts, and digital intrusion efforts after the breach.

75. T.S.'s family reasonably fears the lifelong risks he now faces due to the exposure of his Social Security number and medical information—risks far beyond mere inconvenience.

76. T.S. suffered actual injuries, including the invasion of his privacy and the exposure of sensitive medical and identifying information.

77. T.S. suffered diminution in the value of his Private Information, which Defendants were legally and contractually obligated to safeguard.

78. The Data Breach created a substantial and imminent risk of identity theft, financial fraud, and medical identity misuse—harms that are magnified when the victim is a minor.

79. T.S. and his family will be required to spend substantial time, money, and effort protecting him from the ongoing impact of Defendants' failures.

80. T.S. has a strong continuing interest in ensuring that the Private Information Defendants still retain is properly protected from future compromise.

***Consumers Prioritize Data Security***

81. In 2024, Cisco—a global technology and communications company—published their multi-year *Consumer Privacy Survey*, which highlights the central role data security plays in consumer decision-making.[1] Therein, Cisco reported the following:

a. Privacy has become a foundational requirement for consumer trust. Cisco reported that privacy has evolved from relative obscurity to a customer requirement, with more than 75% of respondents stating they will not purchase from an organization they do not trust with their data.[2]

---

[1] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, *https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf* (last visited March 19, 2025).
[2] *Id*.

b. Data protection is now a prerequisite for commercial success. Ninety-four percent of organizations surveyed agreed that customers will not buy from companies that fail to protect data properly.[3]

c. Consumers overwhelmingly value data privacy, with 89% affirming that they care about data privacy.[4]

d. Consumers are not passive: 83% said they are willing to spend time and money to protect data, and many expect to pay more for services that safeguard their information.[5]

e. Data practices directly influence purchasing behavior: 51% of consumers reported switching providers because of a company's data policies or data-sharing practices.[6]

f. Consistent with the above, 75% of consumers stated they will not purchase from organizations they do not trust with their data.[7]

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

82. Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, uncompensated lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendants' possession—and is thus at risk for future breaches so long as Defendants fail to take appropriate measures to protect the PII.

83. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

84. The value of Plaintiffs and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

85. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

86. One way criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—

first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

87. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

88. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is traceable to the Data Breach.

89. Defendants disclosed the PII of Plaintiffs and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened, disclosed, and exposed the PII of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

90. Defendants' failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbates Plaintiffs and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendants Knew Or Should Have Known the Risk of a Data Breach***

91. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

92. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[8]

93. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[9]

94. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

***Defendants Failed to Adhere to FTC Guidelines***

95. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendants—should use to protect against unlawful data exposure.

96. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use. The FTC declared that, *inter alia*, businesses must:

---

[8] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wpcontent/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[9] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.[10]

97. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

98. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

99. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

[10] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

***Defendants Failed to Follow Industry Standards***

100. Industry and regulatory authorities have long identified baseline cybersecurity practices that businesses like Defendants must implement to safeguard sensitive PII and PHI. These standards include, at minimum: comprehensive employee cybersecurity training; the use of strong and regularly updated passwords; multi-layered security measures such as firewalls, anti-virus, and anti-malware protections; encryption of data at rest and in transit; multi-factor authentication for all privileged accounts; routine system monitoring and timely patching; maintaining secure, segregated backups; and strict access controls that limit which employees may view or handle sensitive data.

101. Additional industry-standard practices required to secure sensitive PII and PHI include: deploying and regularly updating malware-detection and intrusion-prevention tools; monitoring and restricting network ports and protocols; securing web browsers and email systems against phishing and exploitation; properly configuring and maintaining network infrastructure such as firewalls, switches, and routers; protecting physical access points and on-site security systems; safeguarding all communication channels through encryption and monitoring; and providing continuous, role-specific training to staff on cybersecurity risks and response protocols.

102. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of one or more of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04)

and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

103. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

104. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> **All individuals in the United States whose personally identifiable information ("PII") and/or protected health information ("PHI") was accessed, acquired, exfiltrated, compromised, or otherwise exposed in the 2025 data-security incident involving Cerner electronic health record ("EHR"), cloud-hosting, data-migration, or data-storage environments used by or in connection with Children's National Hospital**.

105. Excluded from the Class are Defendants, their officers and directors, members of their immediate families, and the judges assigned to this case and their staff.

106. Plaintiffs reserve the right to amend the class definition.

107. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

108. **Ascertainability**. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control.

109. **Numerosity**. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the putative class consists of thousands

of members—as it includes current and former patients whose information was stored in Defendants' systems.

110. **Typicality**. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendants, and Defendants' complete failure to notify individuals of the Data Breach.

111. **Adequacy**. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Plaintiffs' interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that are experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

112. **Commonality and Predominance**. Plaintiffs' and the Class's claims raise common facts and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants were negligent in maintaining, protecting, and securing PII;

d. if Defendants breached contract promises to safeguard Plaintiffs and the Class's PII;

e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendants' Breach Notice was reasonable;

g. if the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

113. **Superiority**. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class)**

114. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

115. Plaintiffs and the Class (or their third-party agents) entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

116. Defendants owed a duty of care to Plaintiffs and Class Members because it was plainly foreseeable that failing to implement and maintain reasonable, industry-standard data-

security measures would result in the compromise of their PII and PHI. That precise and foreseeable danger materialized here when Defendants' inadequate security allowed cybercriminals to access and exfiltrate Plaintiffs' Private Information.

117. Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII were wrongfully disclosed.

118. Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. Defendants actively sought and obtained Plaintiffs and Class Members' PII. Defendants owed—to Plaintiffs and Class Members—at least the following duties:

a. to exercise reasonable care in collecting, storing, handling, and using the PII and PHI in their possession;

b. to implement and maintain industry-standard and legally required security measures sufficient to protect Private Information from data breaches, unauthorized access, exfiltration, and theft;

c. to promptly detect, identify, and halt any attempted or actual unauthorized access to their systems; and

d. to timely notify Plaintiffs and Class Members of any breach of the security, confidentiality, or integrity of their Private Information so they could take meaningful steps to protect themselves.

119. Thus, Defendants owed a duty to timely and accurately disclose the scope, nature, and occurrence of the Data Breach to Plaintiffs and Class Members. This duty was essential to allow Plaintiffs and Class Members to take appropriate measures to safeguard their PII, remain

vigilant against the heightened risk of harm, and undertake other necessary steps to mitigate the consequences of the Data Breach.

120. Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII that it no longer required under applicable regulations.

121. Defendants' duties arose not only from statute and common law, but from a special relationship created when Plaintiffs were required to entrust their most sensitive medical and identifying information to Defendants as a condition of receiving healthcare.

122. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

123. Defendants' duty to use reasonable security measures arose from the special relationship between Defendants and Plaintiffs and the Class. That relationship existed because Plaintiffs and the Class (or their authorized agents) entrusted Defendants with their confidential PII as a necessary part of receiving services.

124. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

125. PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

126. Defendants improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

127. Defendants breached these duties as evidenced by the Data Breach.

128. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise the way the PII was stored, used, and exchanged.

129. Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

130. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

131. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

132. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

133. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and uncompensated lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

134. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

135. The FTC Act, 15 U.S.C. § 45, and related guidance establish the standard of reasonable care applicable to Defendants' conduct.

136. Under the FTC Act, Defendants have a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

137. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs and the Class Members' sensitive PII.

138. Defendants breached their respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

139. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and

amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

140. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

141. But for Defendants' wrongful and negligent breach of their duties owed, Plaintiffs and Class Members would not have been injured.

142. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they failed to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

143. Defendants' various violations and failure to comply with applicable laws and regulations constitutes negligence *per se*.

144. As a direct and proximate result of Defendants' negligence per se, Plaintiffs and Class Members have suffered—and will continue to suffer—numerous injuries.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (*IN THE ALTERNATIVE*)
## (On Behalf of Plaintiffs and the Class)

145. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

146. Plaintiffs allege Count III in the alternative to Count I.

147. Plaintiffs and Class Members either directly contracted with Defendants or Plaintiffs and Class Members were the third-party beneficiaries of contracts with Defendants.

148. Plaintiffs and Class Members—minor patients and their parents or guardians—were required to provide their PII to Defendants as a condition of receiving medical care at Children's. Plaintiffs and Class Members (or their authorized representatives) provided this PII to Defendants, or to Defendants' agents, in exchange for that medical care.

149. Plaintiffs and Class Members—minor patients and their parents or guardians—entered into implied contracts with Defendants whereby they provided their PII to Defendants, or to Defendants' agents, as a necessary condition of receiving medical care.

150. Plaintiffs and Class Members reasonably understood that Defendants would implement adequate cybersecurity measures to protect the highly sensitive PII they were required to provide in connection with receiving medical services.

151. Plaintiffs and Class Members reasonably understood that Defendants would safeguard their PII based on representations made in Defendants' policies, procedures, and obligations under federal and state law governing the handling of medical and personal information.

152. Plaintiffs and Class Members accepted Defendants' implied offers by providing their PII to Defendants or their agents as a condition of accessing medical services.

153. In turn, Defendants agreed—explicitly through their policies and implicitly through their role as custodian of medical and personal data—to protect the PII from unauthorized access or disclosure.

154. In their Privacy Policies and related notices, Defendants represented that they had a legal and contractual obligation to protect Plaintiffs' and Class Members' PII.

155. Implicit in the parties' agreement was that Defendants would provide prompt and adequate notice of any unauthorized access, use, or disclosure of Plaintiffs' and Class Members' PII.

156. Plaintiffs and Class Members would not have entrusted their PII to Defendants had they known that Defendants would not adequately protect it.

157. Plaintiffs and Class Members fully performed their obligations under the implied contracts by providing accurate PII necessary for medical care.

158. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to their form.

159. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

160. Defendants materially breached the contracts it entered with Plaintiffs and Class Members (or their third-party agents) by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into their computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

161. In these and other ways, Defendants violated their duty of good faith and fair dealing.

162. Defendants material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries.

163. Upon information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

164. Plaintiffs and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

## COUNT IV
## INVASION OF PRIVACY
## (On Behalf of Plaintiffs and the Class)

165. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

166. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

167. Defendants owed a duty to Plaintiffs and Class Members—minor patients and their guardians—to keep their highly sensitive and confidential PII secure and to prevent their disclosure to unauthorized third parties.

168. The unauthorized acquisition—and outright theft—of Plaintiffs' and Class Members' PII by a third party is highly offensive to a reasonable person.

169. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendants, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

170. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

171. Defendants acted with a knowing state of mind when it permitted the Data Breach because they knew their information security practices were inadequate.

172. Defendants acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

173. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

174. As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiffs and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

175. Upon information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

176. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendants with their inadequate cybersecurity system and policies.

177. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiffs and the Class.

178. In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, seek compensatory damages for Defendants' invasion of privacy, including the value of the privacy interest Defendants violated, the cost of future credit and identity-theft monitoring, and all applicable prejudgment interest and costs.

## COUNT V
## UNJUST ENRICHMENT
## (*IN THE ALTERNATIVE*)
## (On Behalf of Plaintiffs and the Class)

179. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

180. Plaintiffs allege Count V in the alternative to Count I.

181. Plaintiffs and Class Members conferred a benefit upon Defendants by providing their highly valuable PII, which Defendants used in connection with their data-processing, storage,

and technology services. Defendants derived substantial economic value from collecting, storing, and utilizing this information.

182. Defendants appreciated or had knowledge of the benefits they received from Plaintiffs' and Class Members' PII.

183. Plaintiffs and Class Members reasonably understood that Defendants would protect the PII they were required to provide in connection with receiving medical services.

184. Defendants enriched themselves by saving the costs they should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

185. Instead of investing in reasonable security measures that would have prevented the Data Breach, Defendants avoided necessary expenditures and increased their profits by implementing cheaper, deficient data-security practices. Plaintiffs and Class Members, in turn, suffered harm as a direct and proximate result of Defendants' failure to secure the PII entrusted to them.

186. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value derived from Plaintiffs' and Class Members' PII because Defendants failed to adequately safeguard that information.

187. Plaintiffs and Class Members have no adequate remedy at law.

188. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
## (On Behalf of Plaintiffs and the Class)

189. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

190. Given the relationship between Defendants and Plaintiffs and Class Members—where Defendants assumed custody and control of their PII—Defendants undertook a fiduciary obligation to act primarily for their benefit: (1) to safeguard Plaintiffs' and Class Members' PII; (2) to timely notify them of any Data Breach or unauthorized disclosure; and (3) to maintain complete and accurate records of what information it stored and where it was stored.

191. Defendants owed a fiduciary duty to act for the benefit of Plaintiffs and Class Members on matters within the scope of their relationship—most critically, to safeguard their PII.

192. Because of the highly sensitive nature of the PII, Plaintiffs and Class Members (or their third-party agents) would not have entrusted Defendants, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices.

193. Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII.

194. Defendants also breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

195. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries.

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Dated: December 23, 2025

By: <u>*/s/Hassan A. Zavareei*</u>
Hassan A. Zavareei (Bar No. 456161)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave. NW, Suite 1010
Washington, D.C. 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com

Sabita J. Soneji (*pro hac vice* application forthcoming)
**TYCKO & ZAVAREEI LLP**

1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
ssoneji@tzlegal.com

*Attorneys for Plaintiffs and the Proposed Class*